The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff<br>v.<br>JOSHUA ADAM SHUEMAKE,<br>Defendant. | NO. CR21-194-RAJ<br>UNITED STATES' SENTENCING MEMORANDUM |

Although the precipitating event for the charges against Joshua Shuemake was his unlawful possession of firearms, the crux of this case was his relentless and deliberate efforts to undermine the administration of justice. Such behavior by any person would be troubling, but when done by a federal law enforcement officer employed by the Department of Justice and charged with upholding the law, Shuemake's conduct is alarming and particularly egregious.

Following a four-day trial, a jury found Joshua Shuemake guilty of unlawful possession of a firearm registered to Luke Ulavale, in violation of a King County domestic violence no-contact order (Count 1); and obstruction of justice for witness tampering of Ulavale (Count 3). The jury found Shuemake not guilty of false statement in a federal investigation (Count 2). Specifically, the witness tampering charge stemmed



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from Shuemake's concoction of "the Dale Story." In the fictitious cover-up, Ulavale loaned his gun to Nicholas Dale, who then inadvertently left it at Shuemake's residence after a night of drinking immediately before the FBI's search. Ulavale initially relayed the Dale Story to the FBI but eventually admitted that the story was false and that he gave Shuemake his gun after Shuemake was arrested in April 2021.

The United States recommends that the Court sentence Joshua Shuemake to 42 months of imprisonment for unlawful possession of a firearm (Count 1) to be served concurrently with 42 months of imprisonment for obstruction of justice by witness tampering (Count 3). This sentence is necessary to reflect the serious nature of the offenses and relevant conduct, to promote respect for the law, and to deter others from engaging in similar conduct. The Court should also impose a three-year term of supervised release following imprisonment and the special conditions recommended by Probation.

## I. BACKGROUND

### A. Joshua Shuemake Abused Power and Trust.

Joshua Shuemake was a Bureau of Prisons correctional officer at FDC SeaTac beginning on August 18, 2019. Within months, Shuemake's arrogance and "false sense about knowing everything there was to know about being an effective Correctional Officer" became apparent. *See* Ex. A, Letter from Warden Israel Jacquez to the Honorable Richard A. Jones (Nov. 21, 2022). Shuemake's supervisors described him as "overzealous" and "aggressive" with inmates, and Warden Jacquez opines that Shuemake would have been terminated during his one-year probationary period if FDC SeaTac had not been overwhelmed with the COVID-19 pandemic and its collateral impacts. *Id*.

***Intimate Relationship with Inmate A.*** Indeed, Shuemake exploited a chaotic time and began an intimate relationship with a female inmate ("Inmate A") at the height of the pandemic in May 2020. Ex. B, Memorandum from Department of Justice Office of the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Inspector General (Nov. 1, 2022) at 1. Their relationship continued for at least a year. Internal and criminal investigators interviewed Inmate A, and after initially denying the relationship, she admitted that she and Shuemake had intimate physical contact in an office bathroom. Inmate A further confirmed that she and Shuemake communicated daily by email. BOP records of inmate communications showed "Fernando Jimenez" (whom Inmate A identified as Shuemake) regularly used ProtonMail, an encrypted email service, to communicate in Spanish with Inmate A. *Id.* Inmate A stated that after her release, Shuemake intended to continue his relationship with her by moving to Arizona (where her family resides) and working with the U.S. Customs and Border Protection. *Id.* Shuemake's actual application to work at CBP and statements about moving to Arizona substantiate this statement. *See, e.g.,* Ex. C, Email from Shuemake to wilsonfed (Apr. 15, 2021). Inmate A stated that she gave Shuemake three photos of herself: one in a black dress, one showing her exposed cleavage, and one of her in prison. Ex. B at 1. These three photos were found in Shuemake's car in 2021.

Inmate A stated that she only confided in Inmate B about her relationship with Shuemake but others observed them together. Inmate B corroborated Inmate A's statements to investigators. Additionally, Inmate B told investigators that she witnessed Shuemake tell another female inmate that he could get her out of trouble for having pills in her cell in exchange for sexual favors. Inmate B further stated that other inmates knew about Shuemake's relationship with Inmate A but feared retaliation if they reported it. This fear was well-founded because when interviewed by investigators, Correctional Officer 1 stated that Shuemake bragged about retaliating against a female inmate who he believed reported him for having sex with another inmate. *Id.* at 3.

***Facilitation of Inmate Assaults.*** From at least April 2020 until March 2021 (when Shuemake was removed from correctional posts), multiple inmates reported that Shuemake disclosed their convictions to other inmates in the same housing area, knowing



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that such disclosure would lead to an inmate's assault. *Id.* at 4. Some inmates transferred themselves to the Secure Housing Unit (SHU) to avoid an imminent threat of assault, others were not so fortunate. Some inmates were punched so hard in the face that stitches were needed to close the resulting lacerations. When inmates attempted to report Shuemake's conduct to authorities or others via email, they would face retaliation from other inmates and Shuemake for "snitching." These reports were corroborated by surveillance footage in the relevant areas, including footage of Shuemake showing his office computer screen to inmates implicated in assaults and threatened assaults. *Id.*

***Pattern of Misconduct and Abuse.*** These specific incidents were part of a broader pattern of misconduct and abuse by Shuemake. He bragged to A.Q. that he could do anything he wanted at FDC SeaTac and get away with it because the union limited the punishment that could be levied against him to being assigned to the computer lab. In an email chain with Nicholas Dale about working at FDC SeaTac, Shuemake boasted:

On Mon, Apr 12, 2021, 6:54 AM
Joshua Shuemake
<jShuemake@bop.gov> wrote:

> After your first year, you can walk into a unit and drop kick an inmate cuz you're having a bad day and you'll just get 3 days on the beach.
>
> DEPARTMENT OF JUSTICE
> **Officer J. Shuemake**
> **Joshua Shuemake**
> **jshuemake@bop.gov**
>
> **"Law enforcement officers do heroic work every day in this country. And at the Department of Justice, we honor every single officer who wears the badge."**
> **-William Barr**

Shuemake also wrote that he would "tornado [inmate] cells like a fuckin drill instructor." *Id.* at 2.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Shuemake's words were not mere bravado. BOP Special Investigative Agent Jesse Valero received complaints about Shuemake on a daily basis, which SIA Valero described as a pattern of "intimidation and retaliation." Ex. D, FBI 302 – Jesse Valero (Oct. 27, 2021). In addition to the conduct described above, Shuemake was notorious for wrecking inmate cells. In an interview with federal investigators, Correctional Officer 2 described Shuemake's cell searches as "obliterating." Shuemake bragged in an email to Ulavale:

>>> Joshua Shuemake 8/24/2020 11:28 AM >>>
I just trashed this dude's cell oldskool style the way I used to since I'm off probation now! LOL

DEPARTMENT OF JUSTICE
Officer J. Shuemake
**Joshua Shuemake**
jshuemake@bop.gov

Shuemake's misconduct was destabilizing for the FDC. By the time he was placed on administrative leave in June 2021, Shuemake's behavior "had wreaked havoc at the facility and created an atmosphere of mistrust and tension among the inmate population against some of the staff members perceived to have been friends with him." Ex. A, Letter from Warden Jacquez. Thus, Shuemake not only terrorized inmates, but he also fostered an unsafe environment for his colleagues.

**B. Joshua Shuemake Unlawfully Possessed Firearms.**

Shuemake's abusive behavior at FDC SeaTac was consistent with his off-duty conduct, and on April 16, 2021, Shuemake was arrested for assaulting his then-girlfriend A.Q. with whom he was living at the time. The King County Prosecutor's Office charged Shuemake with two felonies: Assault in the Second Degree – Domestic Violence and Residential Burglary – Domestic Violence. Those charges are still pending trial in state court.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***King County Court Orders.*** Over the course of less than three weeks, between April 17, 2021 and May 4, 2021, King County courts barred Shuemake from possessing firearms and ordered him to surrender his firearms on four separate occasions in connection with the criminal and civil domestic violence proceedings against him. On May 5, 2021, the day after his arraignment when the final no-contact order was entered in his criminal case, Shuemake filed a Declaration of Non-Surrender in the civil proceeding, claiming, under penalty of perjury, that he had no firearms in his possession. This was one of countless obstructive lies Shuemake would tell about his firearms possessions.

***March—May 2021: Shuemake's Firearms and Alleged Theft.*** When asked by court personnel and law enforcement officers at various times in April and May 2021, Shuemake inconsistently answered the simple question of how many firearms he owned. On April 19, 2021, Shuemake told a Federal Way police officer that he had five guns, which was consistent with information A.Q. provided the King County Prosecutor's Office and Ulavale's testimony to the Grand Jury. *See* PSR at ¶ 15. However, days earlier, when he was arrested for assaulting A.Q., Shuemake told King County Court Services that he had three firearms, and records show that Shuemake had only three firearms registered to him: (1) AR15 Diamondback rifle, serial number DB-1828732; (2) Smith and Wesson M&P VTAC 9 mm, serial number HVN7313; and (3) Smith and Wesson M&P Shield 9 mm, serial number HNV3790.

On April 22, 2021, when the King County Sheriff Deputy served Shuemake with the civil no-contact order and order to surrender firearms, Shuemake claimed that his firearms were in a safe at A.Q.'s residence. This was a lie that Shuemake would repeat countless times, even to Ulavale. In an attempt to bolster this lie and his Declaration of Non-Surrender, on May 10, 2021, Shuemake reported his three registered firearms stolen to Federal Way Police Department. Two days later, he would report the same to his captain at FDC, listing A.Q.'s address as where the firearms had been allegedly stolen.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Zero evidence substantiates Shuemake's theft claim. On the contrary, on April 29, 2021, a Federal Way detective conducted an informal search of A.Q.'s residence and did find any firearms or gun safes. Repeated searches of pawn shop transactions have not yielded any hits.

But perhaps most dispositive is that on April 24, 2021—two days after Shuemake told the King County Sheriff Deputy that his firearms were at A.Q.'s residence—Shuemake went to his storage unit in Covington and was observed removing a handgun, ammunition, and a bulletproof vest from his storage unit. PSR at ¶ 17. Because he last visited the storage unit in March 2021 and Ulavale gave Shuemake his gun after his April 16, 2021 arrest, the handgun Shuemake removed from storage on April 24, 2021 was not Ulavale's. *Id*.

***June 2021—April 2022: Shuemake's Continued Possession of Firearms.*** Shuemake was charged and convicted for his possession of Ulavale's gun seized on June 18, 2021. Evidence gathered during the investigation shows that Shuemake continued to possess other firearms even after the FBI's initial search and seizure. On Sunday, June 27, 2021, agents conducted physical surveillance at Cocos Mariscos Bar in Snohomish and observed Shuemake working security outside while wearing his tactical vest and a jacket despite the temperature being 88 degrees Fahrenheit at the time of the surveillance. Although the jacket concealed Shuemake's hip area where he had worn a holster and firearm in prior surveillance, agents were able to get within close enough proximity to Shuemake to observe an imprint that was consistent with the size and shape of a firearm in a holster, under his jacket and on his hip.

Less than a month later, on July 24, 2021, Shuemake was working security at Cocos Mariscos with Nicholas Dale when an altercation with a group of customers occurred. PSR at ¶ 21. A responding police officer said he was "100% sure" that Shuemake was carrying a real handgun in a holster on his hip and had extra magazines on



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the front of his tactical vest. *Id.* Approximately one month later, in a covertly recorded interview with Snohomish Police and the FBI about the incident, Dale repeatedly stated that Shuemake was armed during the incident. *Id*.

Finally, in connection with Shuamake's bond violation, the FBI recently learned about another incident of unlawful firearms possession that occurred in April 2022. Employees of Ballard Market, one of Shuemake's private security clients, told the FBI that Shuemake had carried a firearm while working at their store. When the manager informed Shuemake that they did not want firearms in the store, Shuemake said he understood and would not do it again.

Investigators continued to make diligent efforts to locate and seize Shuemake's firearms. However, none of Shuemake's registered firearms have been located, and even on the eve of sentencing, Shuemake has not surrendered any of his three registered or two unregistered firearms.

**C. Joshua Shuemake Substantially Interfered with the Administration of Justice.**

***False Statement to SIA Valero.*** Shuemake's immediate response to the FBI's execution of search warrants on his person, vehicle, and April Moon's residence on June 18, 2021, was to lie. Because he knew that Ulavale's gun was at Moon's residence and that he was not allowed to possess firearms, Shuemake attempted to distance himself from Moon's residence by telling SIA Valero that he was living with BOP Counselor Jeff Smith in Lacey, Washington. Ex. E, Memorandum from Valero to McCann (June 18, 2021). Shuemake wanted SIA Valero to give the information to the FBI. *Id*.

In fact, according to Ulavale's Grand Jury testimony, Shuemake told him that he "didn't think the FBI could connect the dots" because Shuemake was not receiving mail at Moon's apartment and was not "officially" living at the apartment.

At trial, Counselor Smith testified that Shuemake never lived with him. Further, while Shuemake stayed at his home for one night in early 2021, he certainly was not



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

staying at Smith's house the week the FBI seized Ulavale's gun in June 2021. Moreover, Special Agent McCann testified that when she received the information from SIA Valero, she took additional investigative steps to rule out that Shuemake was living in Lacey with Smith: she monitored a vehicle tracker obtained pursuant to a warrant, she inquired with the U.S. Postal Service where Shuemake was receiving mail, and she conducted additional interviews, including one with Smith.

***The Dale Story.*** Ulavale told the FBI and the Grand Jury that Shuemake came up with the Dale Story after the FBI seized the firearm from Moon's apartment. Shuemake refined the story over the weeks and months that followed. He persuaded Ulavale to go along with the story and implied that Ulavale could be held responsible for giving Shuemake the gun. PSR at ¶ 23.

On the eve of Ulavale's scheduled interview with the FBI on October 12, 2021, Shuemake, Ulavale, and Moon convened at Moon's apartment. *Id*. at ¶ 24. Shuemake attempted to dissuade Ulavale from going to the interview and opined that the interview was a bad idea because it could only hurt Shuemake. But when Shuemake failed to persuade Ulavale to not go, he reminded Ulavale of the Dale Story. *Id.* at ¶¶ 23-24.

The next day, for over two hours, despite multiple warnings that giving a false statement in the interview was a federal felony, Ulavale maintained the Dale Story. *Id.* at ¶ 24. However, during the interview, agents showed Ulavale the photographs of Inmate A that had been found in Shuemake's possession. Ulavale recognized the inmate but was dumbfounded as to why Shuemake would have the photos in his possession. Although he knew Shuemake was under investigation for an inappropriate relationship with that particular inmate, Ulavale had not believed the allegations and even defended Shuemake to colleagues who raised it. Nearly an hour after being shown the photos and approximately 10 minutes before Ulavale retracted the Dale Story, Ulavale stated, "I learned some things today that I didn't know before . . . .He is my best friend. . . .Those



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

pictures are very concerning to me." Ulavale later testified before the Grand Jury that he ultimately retracted the Dale Story because the agents showed him the photos of Inmate A that were found in Shuemake's possession. *Id.* at ¶¶ 25-26.

***Inmate A's Photos.*** The implications of Shuemake possessing Inmate A's photos weighed heavily on Ulavale, even after the interview. Ulavale testified before the Grand Jury:

> Once the revelation of the pictures came out, it kind of – kind of distorted everything that I had thought, and so I left there with a different understanding of – of the events. And I – my biggest thought was like, Oh, man. Is he the person I thought? I still wanted to believe it, but I kind of felt sick to my stomach, like, physically sick to the point where he was trying to call and meet up with me, and I was like, Not today. Not today. I can't do it. But he was like, No, I need to – I need to be – I need to know what they said. I need to know. Okay. Okay. Well, let's go. We'll meet.

When the friends met, Ulavale confronted Shuemake about Inmate A's photos. Shuemake lied the same way he lied about his possession of Ulavale's gun—by conflating a story that he knew to be nominally true with one that he knew to be materially false. Shuemake claimed that the photos had been left on his car in connection with an incident when someone left a crude note on his car. While Ulavale recalled the note being part of the incident, he had no personal memory of Shuemake mentioning the photos, which Ulavale testified to the Grand Jury would have "elevated" the seriousness of the incident. *Id.* at ¶ 26.

Shuemake told the same false story about the photographs to Moon and told her that he quickly reported the incident to his Captain. This was demonstrably false. No one at the FDC (including Shuemake's Captain) has any record or memory of Shuemake reporting such an incident, and the seriousness of the allegation would have necessitated a written report and follow-up investigation. Ex. B at 2. More obviously, FDC leadership would never have allowed Shuemake to retain personal photographs of a female inmate in his car after reporting such an incident.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

***Continued Contact with Ulavale.*** After planting a seed of doubt in Ulavale's mind about his possession of Inmate A's photos, Shuemake continued to have contact with Ulavale after indictment, in clear violation of his appearance bond. In fact, at Shuemake's detention hearing on November 22, 2021, Magistrate Judge Brian A. Tsuchida unambiguously instructed: "Don't have any contact with L.U., direct, indirect, in any way."

And yet, by happenstance, while reviewing Seattle Police Department body-worn video related to a shooting on May 11, 2022, the government noticed that Shuemake and Ulavale were the security guards at the scene where the shooting occurred. Not only did the footage show Shuemake carrying an item resembling a firearm on his hip, but it also showed Shuemake and Ulavale interacting with ease and walking away from the scene together:






UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Confronted with this undeniable violation of his bond conditions, Shuemake offered the following text exchange with Probation Officer Ben Beetham, dated December 9, 2021:




No reasonable person—and certainly not a federal law enforcement officer who majored in criminal justice—could genuinely interpret the text exchange as giving Shuemake permission to have contact with Ulavale on that day in December 2021, much less five months later. In fact, Officer Beetham specifically stated what while he did not have to leave the REI job on December 9, 2021, he still needed to avoid Ulavale and not be



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

scheduled with Ulavale in the future. While the government happened to obtain video evidence of one instance of Shuemake's pre-trial contact with Ulavale, the ease with which the two interact throughout the video suggests that the occurrence was not an anomaly. *See also* Dkt. 33, Mot. to Revoke Bond (Aug. 11, 2022) at 1-2 (Shuemake and Ulavale also appear in a photo together on a website for a security company incorporated in April 2022).

On August 16, 2022, Judge Tsuchida found Shuemake in violation of his appearance bond by having contact with Ulavale and having unreported employment. Although Judge Tsuchida allowed Shuemake to remain on bond, he admonished Shuemake for seeming "put upon" by the Court's conditions and emphasized that Shuemake did not appear to appreciate that he was charged with serious crimes.

***Ulavale Willfully Evaded Trial Testimony.*** After Shuemake lied to Ulavale about the origins of the Inmate A photos and had continuous contact with Ulavale before trial, it was a natural consequence that Ulavale then deliberately avoided appearing for trial. Evidence of Ulavale's willful evasion (much of which was proffered during the trial outside the presence of the jury) includes the following:

- After being served with a trial subpoena, Ulavale ignored daily voicemail and email messages from the U.S. Attorney's Office's witness coordinator who asked him to contact her about the timing of his testimony.
- When Ulavale appeared at the courthouse for the first day of trial, FBI Special Agents Gudehus and McCann informed him that he would need to return the next day, Tuesday, September 13, 2022, at 9:00 A.M. to testify. Ulavale responded, "OK" and subsequently called his employer to state that he would need to take Tuesday off.

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- However, when Ulavale did not appear the next morning, the government's witness coordinator and Special Agents Gudehus and McCann attempted to contact Ulavale more than a dozen times throughout the day by phone.
- Ulavale's last known residence was with his parents in Everett, and FBI agents contacted Ulavale's mother and father separately. Each parent independently referenced Ulavale's subpoena only requiring him to appear on Monday and refused to assist agents in locating Ulavale. Ulavale's father stated that the agents would need to obtain a search warrant to look inside his residence.
- Agents identified and located Ulavale's girlfriend at her workplace, but she was uncooperative, even after being informed that the Court had issued a material witness warrant. No one answered the door at his girlfriend's Renton apartment.
- In the evening of September 13, the government sought and obtained a pen tracking warrant to assist in locating Ulavale.
- In the early morning hours of September 14, 2022, agents gained access to a secure parking garage near Ulavale's girlfriend's apartment and found Ulavale's car with a copy of the trial subpoena in the front passenger seat. The agents then waited outside his girlfriend's apartment until she returned from her overnight work shift. When she did, she was combative and refused to assist. As other agents worked on obtaining a search warrant to enter the residence, Ulavale eventually came to the door. Agents negotiated with Ulavale for approximately 10 minutes through a cracked door to convince him to voluntarily exit the home and be brought to court for trial.
- Before Ulavale arrived at the courthouse, Shuemake's defense attorney provided the government with the name and phone number of Ulavale's newly retained counsel.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In total, 19 FBI agents and additional government resources were necessary to locate and escort Ulavale to court to testify for trial. PSR at ¶ 35.

As the Court saw at trial, on the stand, Ulavale alternated between invoking his Fifth Amendment rights and feigning memory loss during his direct examination. *Id*. Shuemake elicited false testimony on cross-examination that suggested Ulavale was coerced into retracting the Dale Story because the FBI threatened him with prosecution and he was not advised of his right to counsel. *Id*. Ulavale's grand jury testimony was unequivocal: he affirmatively declined counsel after being advised of his right to counsel and he testified that he abandoned the Dale Story because he was perturbed by Shuemake's possession of Inmate A's photographs.[1]

**D. Joshua Shuemake Suborned Perjury at Trial.**

Despite already being charged with two counts for false statements and witness tampering, Shuemake continued his pattern of arrogance and obstruction when he suborned perjury by offering Nicholas Dale's testimony about the Dale Story. *Id.* at ¶ 39; *see* Ex. F, Tr. Testimony of Nicholas Dale (Sept. 14, 2022) at 4-7. By finding Shuemake guilty of both unlawful possession of a firearm (Count 1) and witness tampering (Count 3), the jury necessarily found that the Dale Story was false.

Because Shuemake concocted the Dale Story himself, Shuemake knew (1) Dale's testimony would be false; and (2) Dale knew his testimony would be false. Ulavale's admitted Grand Jury testimony stated that while it was true that Dale had drinks at Moon's residence with Sheumake the night before the FBI seizure, the rest of the Dale Story was lies. Ulavale did not lend his gun to Dale, and Dale did not bring the gun to April's residence. By telling the Dale Story under oath, Dale knowingly committed perjury.

---

[1] Before trial, the government agreed not to introduce evidence of Shuemake's relationship with Inmate A. The government continued to abide by that agreement during trial, notwithstanding the fact that the defense cross-examination of Ulavale opened the door to evidence of that relationship.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Dale's materially false trial testimony included the following:

- When defense counsel presented Ulavale's seized firearm, Dale falsely stated: "This is the H&K 9mm that Luke Ulavale loaned to me." Ex. F at 4, line 21. Dale further testified that Ulavale loaned it to him in January of 2021. *Id.* at 4, line 23.
- When defense counsel asked Dale if he brought Ulavale's gun to Moon's residence around June 17, 2021, Dale testified, "Yes, I did." *Id.* at 5, line 14.
- In response to questions about what Dale did with Ulavale's gun on June 17, 2021, Dale stated that he placed the gun "near the closet" in "Josh and April's bedroom." *Id.* at 6, lines 3-5, 11.
- Dale testified that he slept on the couch for a few hours at the end of the night and left Ulavale's firearm behind when he left. *Id.* at 7, lines 1-4.

On cross-examination, Dale conceded that despite knowing that Ulavale's gun had been seized by the FBI and that Shuemake had been charged with unlawful possession of the gun, he made no attempt to tell the FBI or any other authority that he supposedly left Ulavale's gun in the apartment. *Id.* at 19, lines 2-24. It was only when Shuemake offered Dale's testimony at trial did Dale think it would be appropriate to reveal this potentially exonerating information.

## II. SENTENCING GUIDELINES CALCULATIONS

The United States agrees with the Probation Office on the Sentencing Guidelines calculations and has no objections to the facts contained in the PSR.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The following calculation applies for Counts 1 and 3, which are grouped pursuant to USSG 3D1.2(c):

| **Item** | **Guideline** | **Adjustment** |
|---|---|---|
| Base Offense | 2J1.2(a) | 14 |
| Substantial Interference with Administration of Justice | 2J1.2(b)(2) | +3 |
| Extensive in Scope, Planning, or Preparation | 2J1.2(b)(3)(C) | +2 |
| Obstruction of Justice | 3C1.1 | +2 |
| **Total** | | **21** |

*See* PSR at ¶¶ 33-43.

Consistent with Application Note 7 of USSG 3C1.1, a two-level enhancement for obstruction based on subornation of perjury during the prosecution of charged offenses is warranted and does not result in impermissible double-counting. The base offense level and specific offense characteristics hold Shuemake accountable for his tampering of Ulavale and his lies to obstruct the FBI investigation into his unlawful possession of a firearm. Separate and apart from that conduct, Shuemake significantly further obstructed the prosecution of the charged offenses by suborning perjury at trial. *See United States v. Hahn*, No. 20-10417, 2022 WL 16707180 at *2 (9th Cir. Nov. 4, 2022) (affirming two-point obstruction enhancement when the conduct underlying the enhancement is not the same as the obstruction of justice crime of conviction and constituted a "significant further obstruction"); *see also United States v. Fries*, 781 F.3d 1137, 1154-55 (9th Cir. 2015) (affirming two-point obstruction enhancement applied to grouped offenses because false statement conviction did not fully encompass defendant's obstructive conduct).

Moreover, case law has established that a two-level enhancement for obstruction of justice pursuant to USSG 3C1.1 is appropriate when a defendant suborns perjury for his trial. *See, e.g., United States v. Cabaccang*, 481 F.3d 1176, 1186-87 (9th Cir. 2007)



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(affirming application of obstruction enhancement when trial court cited the testimony of multiple witnesses to find that the defendant suborned perjury); *United States v. Bradberry*, 466 F.3d 1249, 1255 (11th Cir. 2006) (affirming application of obstruction enhancement when a defendant calls a witness to testify on his behalf knowing that the witness will give perjured testimony).

The defendant's criminal history category is I. PSR at ¶ 46. The resulting Guidelines range for Counts 1 and 3 is 37 to 46 months.

## III. SENTENCING RECOMMENDATION

The United States recommends that the Court impose a total term of imprisonment of 42 months.

For the reasons set forth below, this recommendation is appropriate given the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to ensure adequate general deterrence, and to protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(C).

### A. The Nature and Circumstances of the Offense—Shuemake's Substantial and Continuous Obstruction of the Administration of Justice is an Aggravating Factor.

King County judges repeatedly and clearly barred Shuemake from possessing any firearms, ammunition, or other dangerous weapons. But Shuemake's actions demonstrate that he never had any intention to abide by these orders. Within a week of his release from King County jail in April 2021 and two days after telling a King County Sheriff Deputy that his firearms were at A.Q.'s residence, Shuemake retrieved a firearm from his storage unit that has never been surrendered or recovered. Around the same time, he asked to borrow Ulavale's gun. But not only did he violate the orders, he made deliberate and continuous attempts to subvert the judicial system throughout the investigation, while he was released on bond, and even during his trial. But for the FBI's persistent and thorough investigative efforts, he might have succeeded.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Shuemake's conduct falls squarely within multiple categories of conduct that warrant upward adjustments under the Guidelines and associated case law: corruptly persuading a witness to lie, directly or indirectly, or attempting to do so; committing, suborning, or attempting to suborn perjury; providing materially false information to a judge; and providing a materially false statement to a law enforcement officer that significantly obstructed the official investigation or prosecution of the instant offense. *See* USSG 3C1.1 Application Note 4. Accordingly, Shuemake's substantial and persistent obstruction of the administration of justice is an aggravating factor.

**B. Defendant's History and Characteristics**

**1. Shuemake's Position of Trust and Authority is an Aggravating Factor.**

Throughout the investigation, Shuemake readily identified himself as a sworn law enforcement officer. He told investigating officers from Federal Way that he was "with SeaTac," which they interpreted as meaning he was a sworn officer with the City of SeaTac. When Shuemake appeared before the King County judge on May 4, 2021, he represented to the court that he worked for the Department of Justice. He identified himself as law enforcement to local law enforcement officers he encountered while working off-duty armed security in violation of BOP policy. He attempted to exploit the implicit trust within the judicial system that is conferred upon sworn law enforcement officers. And yet, Shuemake not only failed to meet the basic minimum standard of being a law-abiding citizen, but he also fell woefully short of the ethical standards of a federal law enforcement officer by undermining the administration of justice at every turn.

Honesty and integrity must be the foundations of law enforcement. Those charged with the responsibility of administering justice cannot deliberately and actively undermine it for their own ends. In fact, there are few things more dangerous than a law enforcement officer who not only reflexively abuses his power and authority but brags about it. Shuemake's contempt for the law and deliberate attempts to undermine justice are a reflection of his belief that he is above the law. But no one is above the law, least of all those trusted to enforce it.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 2. Shuemake's Pattern of Abuse and Misconduct is an Aggravating Factor.

Shuemake's commission of the charged offenses are consistent with his pattern of abuse and misconduct at FDC SeaTac that was substantiated by the Department of Justice Office of Inspector General. As discussed in detail above and in the Office of Inspector's Memorandum (Exhibit B), Shuemake abused his position of authority by having an intimate relationship with a female inmate. He attempted to conceal his wrongdoing by using an encrypted email service to communicate with the inmate in Spanish, having intimate contact with the inmate in non-surveilled areas of the facility, and concocting a cover-up story for how he came into possession of sexually suggestive photos of Inmate A. He facilitated the assaults of and threats against sex offender inmates by disclosing their offenses to other inmates. Any inmate who reported or attempted to report Shuemake's misconduct was met with retaliation. Throughout his employment with BOP, Shuemake worked unauthorized armed security for private employers. Shuemake knew this violated BOP policy and continued his pattern of conflating nominally true facts with material lies by representing to his supervisor that he worked "unarmed" off-duty security jobs. *See* Ex. B at 3.

Shuemake's pattern of misconduct also predates his BOP employment. Although he does not have prior convictions, he was arrested for domestic violence charges on three occasions between 2006 and 2008. His military service ended with a General Under Honorable Discharge because of multiple disciplinary actions for underage consumption. When viewed in isolation, these instances may be mitigated for his youth or immaturity. When viewed in totality, it is apparent that the consequences of those choices were insufficient to deter him from criminal behavior later in his adulthood.

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### C. A Substantial Term of Imprisonment is Necessary to Ensure Adequate Deterrence, Promote Respect for the Law, and is Just Punishment for the Offenses.

A substantial term of imprisonment is necessary to ensure adequate deterrence for Shuemake, whose willingness to subvert justice and contempt for the law when it conflicts with his own interests is boundless. Shuemake's violation of this Court's orders even after conviction underscores the necessity for a substantial term of imprisonment to deter him from further criminal activity. A substantial term of imprisonment is also necessary to ensure others in positions of authority and trust—particularly other law enforcement officers—are sufficiently deterred from similar conduct. Moreover, it is particularly important that Shuemake's sentence promote respect for the law and provide just punishment for a federal law enforcement officer who was relentless in undermining the administration of justice for his own benefit.

## IV. CONCLUSION

The Court should sentence Shuemake to 42 months of imprisonment and impose a three-year term of supervised release following imprisonment with the special conditions recommended by Probation.

Dated: December 9, 2022

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

*s/ Cindy Chang*
CINDY CHANG
JESSSICA MANCA
Assistant United States Attorneys
700 Stewart Street, Ste 5220
Seattle, WA 98101
Telephone: (206) 553-7970
Fax: (206) 553-0582
Email: Cindy.Chang@udsoj.gov
Jessica.Manca@usdoj.gov